UNITED STATES of America,
Plaintiff,

v.

David F. ROSEN, Defendant.

No. CR 03–1219 AHM.

United States District Court,
C.D. California.

March 23, 2005.

Michael Robert Doyen, Los Angeles, CA, Paul M. Sandler, Baltimore, MD, for defendant.

### ORDER RE: DEFENDANT'S MOTIONS TO DISMISS THE INDICTMENT

MATZ, District Judge.

Defendant David Rosen ("Rosen") has been charged in four counts with causing false statements to be filed with the Federal Election Commission ("FEC"), in violation of 18 U.S.C. §§ 1001(a) and 2. Rosen moves to dismiss all counts in the indictment on three separate grounds: (1) the FEC is not within the executive branch of the Government of the United States and, accordingly, none of the false statements alleged in the Indictment was "within the jurisdiction of the executive, legislative or judicial branch of the Government" within the meaning of 18 U.S.C. § 1001(a); (2) venue in this Central District of California is improper; and (3) the indictment was unlawfully sealed. Rosen also moves to dismiss Counts Two, Three and Four based on multiplicity.

### SUMMARY OF RULINGS

The Court DENIES Rosen's motion to dismiss the Indictment for "failure to allege elements" (as he puts it) of 18 U.S.C. § 1001, a jurisdictional challenge; DENIES Rosen's motion to dismiss the Indictment for improper venue; DENIES without prejudice Rosen's motion to dismiss the Indictment for unlawful sealing; and GRANTS IN PART and DENIES IN PART Rosen's motion to dismiss for multiplicity.

### THE INDICTMENT

Defendant David Rosen, an experienced political fundraiser who has been associated with several campaigns for federal office, was the National Finance Director for the 2000 senatorial campaign of "Senator A."[1] Indictment, ¶ 1. As part of the election campaign, a joint fundraising committee ("JFC") was established under the Federal Election Campaign Act of 1971 ("FECA"), 2 U.S.C. § 431(4), and organized under regulations promulgated by the FEC. *Id.*, ¶ 2. The JFC was legally permitted to raise both "hard money" (federal funds) and "soft money" (non-federal funds), as well as accept "in-kind" contributions in the form of free or discounted goods or services. *Id.*, ¶ 4.

The JFC was required to prepare and file financial disclosure reports with the FEC on a quarterly basis. *Id.*, ¶ 6. The reports were to include, among other things, the total amount of all funds received and all disbursements made by the JFC in connection with joint fundraising activities, as well as the source and total amount of contributions, including in-kind contributions, received from prohibited sources such as corporations. *Id.* Additionally, the JFC was required to maintain documents related to contributions, donations and expenditures for inspection by the FEC. *Id.*

As National Finance Director for the campaign, Rosen's obligations included soliciting and collecting donations, assisting in planning for fundraising events, working with donors, and reviewing invoices and bills associated with fundraising events. *Id.*, ¶ 7. Rosen's duties also included an obligation to accurately report to the JFC's FEC compliance officer in Washington, D.C., the source and amount of contributions received, and expenses incurred, from fundraising events. *Id.*, ¶ 8. It was the compliance officer, however, who was

1. The press has identified "Senator A" as Senator Hillary Rodham Clinton, of New York.

responsible for preparing and filing the JFC's reports with the FEC. *Id.*

From in or about July 2000 to and including in or about August 2000, Rosen worked out of a media company's corporate offices in Los Angeles, California. He was planning an August 12, 2000, fundraising event to benefit the Senate campaign ("the Hollywood Gala"). *Id.,* ¶ 10. The media company was affiliated with a "wealthy contributor" who pledged to underwrite the costs. *Id.,* ¶ 9. Rosen was responsible for all fundraising, planning, costs, and expenses for the Hollywood Gala. *Id.,* ¶ 10.

Between July 2000, up to and including in or about October 2000, the wealthy contributor paid more than $1.1 million to produce the Hollywood Gala. *Id.,* ¶ 11. The contributor used several corporate entities he controlled to make these payments, which had to be disclosed to the FEC as in-kind contributions or donations. *Id.*

In or about August 2000 through October 2000, Rosen provided the JFC's compliance officer with information about the costs of the Hollywood Gala, in-kind contributions and donations received, all for the purpose of enabling the compliance officer to prepare the JFC's third-quarter filing with the FEC. *Id.,* ¶ 13. Rosen understated the costs and approximately $1.1 million of in-kind contributions and donations made by the wealthy contributor. *Id.*

In response to requests from the compliance officer for documentation supporting the costs of the concert portion of the Hollywood Gala, Rosen instructed a member of the Hollywood Gala planning team to obtain a fictitious invoice in the amount of $200,000 for the concert production costs, knowing that the costs were substantially greater than that figure. *Id.,* ¶ 14. In or about August and September 2000, Rosen faxed receipts and invoices for

goods and services provided at the Hollywood Gala. The faxes were sent from Los Angeles to the JFC's compliance officer in Washington, D.C., and they included the fictitious $200,000 invoice. *Id.,* ¶ 15. In addition, Rosen withheld other true costs of the Hollywood Gala from the compliance officer. *Id.*

In or about October 2000, Rosen provided a summary of costs, in-kind contributions and donations associated with the Hollywood Gala to the JFC's compliance officer, knowing that the compliance officer would use this information to prepare mandatory FEC filings. *Id.,* ¶ 16. Rosen also used the telephone and "fax" machine to provide the compliance officer with additional financial information. *Id.* When the compliance officer asked Rosen about some of the in-kind contributions and Hollywood Gala expenses that Rosen had provided, Rosen informed the compliance officer over the telephone that the numbers were accurate. *Id.,* ¶ 17.

On or about October 15, 2000, the compliance officer submitted the JFC's Third Quarterly Report to the FEC, covering the time period of July 1, 2000 through September 30, 2000. On Schedule H–3 of Form 3X, the JFC reported to the FEC that it received $366,564.69 in in-kind contributions in connection with the Hollywood Gala, when in fact the JFC had received approximately $1.1 million in in-kind contributions and donations. *Id.,* ¶ 18.

On or about January 30, 2001, the JFC filed a required amended report and disclosed additional expenses for the Hollywood Gala on Schedule H–3, this time reporting $401,491 in in-kind contributions and donations. *Id.,* ¶ 19.

In response to an inquiry from the FEC regarding the Hollywood Gala, on or about July 30, 2001, the treasurer of the JFC submitted a letter to the FEC stating that

the JFC's accounting of in-kind contributions for the Hollywood Gala was accurate and repeating the $401,419 figure for non-federal in-kind contributions and donations. *Id.*, ¶ 21.

The treasurer sent the foregoing letters in reliance on information provided by Rosen. *Id.*

In Counts One through Three, the government charges Rosen under 18 U.S.C. §§ 1001[2] and 2. These counts all allege that he knowingly and willfully caused a materially false, fictitious and fraudulent statement and representation to be made to the FEC. Count One alleges that Rosen caused the JFC to file a report with the FEC on October 15, 2000 falsely declaring that the JFC received only $366,564.69 in in-kind contributions for the Hollywood Gala, when in fact, as Rosen knew, the JFC received substantially more than that amount. *Id.* Count Two alleges that Rosen caused the JFC to file an amended report with the FEC on January 30, 2001 falsely declaring that the JFC only received $401,419.03 in in-kind contributions for the Hollywood Gala, when in fact, as Rosen knew, the JFC received substantially more than that amount. *Id.* Count Three alleges that Rosen caused the JFC to send to the FEC a July 30, 2001 letter that falsely stated that the JFC had raised $401,419.03 for the Hollywood Gala, when in fact, as Rosen knew, the JFC received substantially more than that amount. *Id.*

In Count Four, the government charges Rosen under 18 U.S.C. §§ 1001 and 2 with knowingly and willfully causing a false writing and document to be made to the FEC. Specifically, the government alleges that Rosen caused individuals involved with the production of the Hollywood Gala to create a fictitious invoice for $200,000 and that Rosen provided this fictitious invoice to JFC compliance officers as support for expenses incurred, knowing that the JFC would rely on this document in preparing filings with the FEC and that the document would be available for inspection by FEC officials conducting an audit or review of the JFC's fundraising activities.

## DISCUSSION

### I. Motion to Dismiss for "Failure to Allege Elements"

The indictment alleges that the FEC is an independent regulatory agency whose mission is to administer and enforce the FECA. ¶ 5. It does not allege that the FEC is within the executive, legislative or judicial branch of the government. Rosen argues that the entire Indictment should be dismissed because § 1001 (as amended in 1996) does not prohibit false statements to the FEC. He argues that the FEC is an independent agency that is not within the executive branch of the government, and that because § 1001 prohibits the making of a "false, fictitious, or fraudulent statement" "within the jurisdiction of the executive, legislative, or judicial branch of the Government," there is no jurisdiction under 18 U.S.C. § 1001 for statements made to the FEC.

The government argues that the FEC is in the executive branch and that § 1001 covers statements to the FEC today, just

---

**2.** § 1001(a) provides: "(a) Except as otherwise provided in this section, whoever, in any matter within the jurisdiction of the executive, legislative, or judicial branch of the Government of the United States, knowingly and willfully—(1) falsifies, conceals, or covers up by any trick, scheme, or device a material fact; (2) makes any materially false, fictitious, or fraudulent statement or representation; or, (3) makes or uses any false writing or document knowing the same to contain any materially false, fictitious, or fraudulent statement or entry; shall be fined under this title [and] imprisoned not more than 5 years...."

as it indisputably did prior to the 1996 amendments.

The Court DENIES Defendant's motion to dismiss for "failure to allege elements" because his premise is entirely unfounded. The FEC is an independent agency within the Executive Branch of the federal government.

In 1976, in response to the Supreme Court's decision in *Buckley v. Valeo*, 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976), regarding the constitutionality of certain expenditure limits on campaign contributions, Congress amended the Federal Election Campaigns Act. In the Senate Report accompanying the amendment, under the section entitled "Purpose of the Bill," the Senate stated that "[t]his recommended legislation is a measure designed to reconstitute the Federal Election Commission as an independent executive branch agency ...." S. Rep. 94–677, 94th Cong., 2d Sess. 1, 1 (1976), reprinted in 1976 U.S.C.C.A.N. 929; *see also Teper v. Miller*, 82 F.3d 989, 996, n. 7 (11th Cir. 1996). This legislative history, which the parties failed to cite, establishes that the FEC is located within the executive branch. The Court has not found any case law, nor has Defendant cited any, which has held to the contrary.[3]

## II. Motion to Dismiss for Improper Venue

Rosen moves to dismiss all counts for improper venue. He argues that all four counts are based on the filing with, and receipt of reports by, the FEC; that the reports were prepared by the JFC in Washington, D.C.; and that, as required by law, they were filed in the FEC's Washington, D.C. offices. Relying primarily on the Supreme Court's decision in

*Travis v. United States*, 364 U.S. 631, 81 S.Ct. 358, 5 L.Ed.2d 340 (1961), Rosen argues that, under § 1001, venue for making false statements to the FEC is proper only in the place of filing (Washington D.C.). Rosen points to these passages from *Travis*:

> The false statement statute, under which the prosecution is brought, penalizes him who knowingly makes any 'false' statement 'in any matter within the jurisdiction of any department or agency of the United States.' There would seem to be no offense, unless petitioner completed the filing in the District of Columbia.
>
> The locus of the offense has been carefully specified; and only the single act of having a false statement at a specified place is penalized.

*Travis*, at 635, 637, 81 S.Ct. 358.

The government argues that Rosen misinterprets *Travis*, that causing false statements to be filed with the FEC in violation of §§ 1001 and 2 is a continuing offense, and that venue is proper where the conduct began, continued or ended. Because some of Rosen's alleged conduct took place in Los Angeles, it argues, venue is proper in the Central District of California.

The Court DENIES Rosen's motion to dismiss for improper venue.

### A. General Venue Principles

■ Venue in criminal cases is not a mere matter of formal procedure but raises deep issues of public policy. *United States v. Johnson*, 323 U.S. 273, 276, 65 S.Ct. 249, 89 L.Ed. 236 (1944). The government must establish venue by a preponderance of the evidence. *United*

---

**3.** At the hearing on these motions, neither party challenged or even addressed the foregoing analysis, which was in a tentative opinion the Court circulated before the hearing began. Thus, the Court will not discuss the interesting and imaginative, but misplaced, arguments the parties made in their briefs.

*States v. Powell,* 498 F.2d 890, 891 (9th Cir.1974). When a defendant has been indicted on multiple counts, venue must be proper for each count. *United States v. Pace,* 314 F.3d 344, 347 (9th Cir.2002). The Constitution and the Federal Rules of Criminal Procedure provide that a defendant will be tried in the state and district where the charged offense was allegedly committed. Art. III, § 2, clause 3; U.S. Const. Amend VI; Fed.R.Crim.P. 18. In determining where the offense was committed, courts look to the "nature of the crime alleged and the location of the act or acts constituting it." *United States v. Anderson,* 328 U.S. 699, 703, 66 S.Ct. 1213, 90 L.Ed. 1529 (1946). In making that determination, looking at the "key verbs" that define the criminal offense is helpful. *United States v. Mendel,* 746 F.2d 155, 164 (2d Cir.1984).[4]

Section 1001, under which Rosen is charged, does not contain an express venue provision. Courts have relied on 18 U.S.C. § 3237 to determine venue under § 1001. *See United States v. Wiles,* 102 F.3d 1043, 1064 (10th Cir.1996). Section 3237(a) provides that: "Except as otherwise expressly provided by enactment of Congress, any offense against the United States begun in one district and completed in another, or committed in more than one district, may be inquired of and prosecuted in any district in which such offense was begun, continued, or completed."

### B. Venue in this District is Proper

The key factors in assessing venue in this case are that Defendant is alleged to have *caused* false reports to be made, and that he did so, in part, through actions he undertook in the Central District of California. The Court therefore construes the indictment to charge a violation of 18

U.S.C. § 2(b), not 2(a). Under § 2(b), "a person may be guilty of causing a false claim to be presented to the United States even though he uses an innocent intermediary ... to actually pass on the claim[ ]." *United States v. Catena,* 500 F.2d 1319, 1323 (3rd Cir.1974). "[I]t is well-established that [18 U.S.C.] § 2(b) was designed to impose criminal liability on one who causes an intermediary to commit a criminal act, even though the intermediary who performed the act has no criminal intent and hence is innocent of the substantive crime charged." *United States v. Hopkins,* 916 F.2d 207, 215 (5th Cir.1990) (upholding conviction for filing false statement with FEC).

It appears that only one court has squarely addressed the question raised by Rosen of the appropriate venue for a prosecution under §§ 1001 and 2 for causing a false statement to be made the FEC. In *United States v. Curran,* 1993 WL 137459 (E.D.Pa.1993) *vacated on other grounds,* 20 F.3d 560 (3rd Cir.1994), a defendant was charged with causing the treasurers of political campaign committees to file reports containing false information with the FEC, in violation of §§ 1001 and 2(b). The District Court rejected his claim that proper venue existed only in Washington, D.C. Instead, the Court held that "the scheme to cause false reports to be filed and all of the causative acts were carried out in the Eastern District of Pennsylvania," and therefore under 18 U.S.C. § 3237(a), venue was proper in Pennsylvania. Although on appeal the *Curran* decision was vacated, the Court nevertheless finds its reasoning on the venue issue persuasive.

Neither party cited another decision, *United States v. Hopkins,* 916 F.2d 207,

---

**4.** For the reasons explained below, the "key verb" in this indictment is "caused" [to be    filed].

216 (5th Cir.1990), involving a conviction for making a false submission to the FEC, but it is instructive. In *Hopkins,* defendants were convicted of, among other things, causing the concealment of a material fact from the FEC in violation of §§ 1001 and 2(b). In *Hopkins,*

"... the defendants devised a scheme by which the savings and loans which they controlled would make political contributions indirectly: individual officers and employees of the institutions would be required to make contributions and would then be reimbursed for those contributions by the institution. The reimbursements were disguised either as pay raises or as reimbursements for legitimate business expenses. In the course of this scheme, the defendants falsified various records of the financial institutions involved and concealed certain facts from both bank examiners and federal election authorities." *Hopkins,* at 210–11.

As a result of this scheme, Defendants were charged (among other things) with knowingly and willfully causing another to conceal a material fact from the FEC. Their conviction was upheld. The Fifth Circuit stated that:

"While it may be true that the Hopkins [sic] themselves did not make the reports, it is clear that they deliberately caused those reports to contain false information. The evidence showed that by keeping him unaware of their scheme, the Hopkins [sic] caused another individual, the Treasurer of their political action committee, to report to the Federal Election Commission that the contributions to the political action committee were from individuals." *Hopkins,* at 215.

In *Hopkins,* apparently, no one contended that a § 1001 prosecution for a false FEC filing could be mounted only in the District of Columbia, and so the court did not address any venue issue. But it is noteworthy that the defendants were prosecuted and convicted in the Northern District of Texas, not the District of Columbia.

■ As in *Curran* and *Hopkins,* Rosen is charged with causing an officer of a political campaign committee to file reports containing false information with the FEC in violation of §§ 1001 and 2. Because Rosen's alleged conduct in causing the false statements to be made occurred, at least in large part, in Los Angeles, it does not matter that the report was ultimately filed in Washington, D.C., as required by the FECA. The criminal conduct charged occurred in this District; therefore, venue is appropriate here as a matter of law.

Defendant's reliance on *Travis v. United States,* 364 U.S. 631, 81 S.Ct. 358, 5 L.Ed.2d 340 (1961) is misplaced. In *Travis,* the defendant was charged under § 9(h) of the National Labor Relations Act for filing false non-Communist affidavits. The Court held that venue was proper only where the false statements were filed (Washington D.C.), and not where the defendant had executed and mailed them (Colorado). The decision hinged on the fact that the filing of the affidavits was not mandatory, but was a condition precedent to a union's use of the Board's procedures. *Id.,* at 635, 81 S.Ct. 358. The Court reasoned that "the filing must be completed before there is a matter within the jurisdiction of the Board within the meaning of the false statement statute." *Id.,* at 636, 81 S.Ct. 358. Therefore, because "the locus of the offense ha[d] been carefully specified ... only the single act of having a false statement at a specified place [was] penalized." *Travis,* 364 U.S. at 637, 81 S.Ct. 358.

Several cases distinguish *Travis* on grounds applicable here. In *United States*

*v. Wiles,* 102 F.3d 1043 (10th Cir.1996), defendants were charged under § 1001 with making false statements to the SEC in violation of 15 U.S.C. § 78m(a). The Court noted that § 1001 specifically proscribes the making of false statements and concluded that "the whole process of filing .. constitute[s] the offense in this instance." *Id.,* at 1065. The Court held that venue on the § 1001 charge was proper in the District of Colorado (where the false 10–K report was made), rejecting defendants' argument, based on *Travis,* that venue was proper only in Washington, D.C., where the 10–K report was filed.

In an effort to distinguish *Wiles,* Rosen argues that the records in *Wiles* had to be made and kept, and that a failure to do so was unlawful, whereas no such requirements apply to the FEC and to what Rosen is accused of here. Rosen is incorrect. Title 2 U.S.C. § 437g(d) makes it a crime to "knowingly and willfully commit[ ] a violation of *any* provision of [the Federal Election Campaigns Act]." (Emphasis added). Title 2 U.S.C. § 434(a) requires political campaigns to make and file reports, and pursuant to 11 C.F.R. § 104.14, campaigns must maintain records and keep all reports for inspection.

In *United States v. Mendel,* 746 F.2d 155 (2nd Cir.1984), Defendant was charged in the Southern District of New York with making and causing to be made false statements to the United States Department of Agriculture, in violation of §§ 1001. M & S caused veterinarians to pre-sign test records and health certificates before they were completed and also caused its bookkeeper to prepare the false test records and health certificates, all within the Southern District of New York. The reports were filed in the Northern District of New York. The Second Circuit held that venue under § 1001 "lies where a false statement is prepared and signed, though it may have been filed elsewhere." *Men-*

*del,* at 165. The court called defendants' "reliance on *Travis* and its progeny ... misplaced." *Id.* It noted that *Travis* "surely was meant to be confined to the facts on the unusual statute involved. *Travis* merely limits the general venue statute in accord with Congress' specific mandate." *Id.* (quoting *United States v. Slutsky,* 487 F.2d 832 (2d. Cir.1973)).

In *United States v. Herberman,* 583 F.2d 222 (5th Cir.1978), the defendant was charged with making false Medicare statements in violation of § 1001. As is the case with the FEC, but was not the case with the NLRB in *Travis,* the relevant statute in *Herberman,* 42 U.S.C. § 1395f(a), authorized the Department of Health, Education and Welfare's to regulate the defendant's conduct before the time of filing. For that reason, the Court of Appeals applied § 3237 and found venue was appropriate in the Western District of Texas, where the alleged false statements were prepared and mailed. *Id.* The Court rejected Herberman's contention that venue should have been in the Northern District of Texas, where the forms were filed. The court applied the general venue statute (18 U.S.C. § 3237) and stated that "*Travis* merely limits the general venue statute in instances where Congress has particularly limited jurisdiction to the time of filing." *Id.,* at 227.

The other cases on which Defendant primarily relies besides *Travis* are also distinguishable. In *Reass v. United States,* 99 F.2d 752 (4th Cir.1938), defendant was indicted for making false statements to a bank. The documents were prepared, filled out and signed in West Virginia, but submitted in person in Pittsburgh, Pennsylvania. The court reasoned that the "mere assembling of the material and its arrangement in a written composition containing misrepresentations of fact can have no effect [because] it is only when they are

communicated to the lending bank that the crime takes place." The court held that the entire offense occurred in Pennsylvania, so venue was appropriate only there. *Reass* involved a loan application. No one is required to apply for a loan. FEC reports, in contrast, are not like loan applications; rather, they must be compiled, maintained and filed. In addition, *Reass* involved the prosecution of the person who actually made the report, not an individual (like Defendant here) who caused the false reports to be filed by another. The legal wrong that Rosen is charged with involved his manipulation of others (who could have been innocent in their own right) and that manipulation was allegedly undertaken, in part, in the Central District of California.

*United States v. Katzoff*, 268 F.Supp.2d 493, 499 (E.D.Pa.2003) held that in a prosecution for violation of 18 U.S.C. § 1014, the mere preparation and execution of a false statement in one district is insufficient as a matter of law to establish proper venue under § 3237 in that district, because the offense "does not begin until the statement has been imparted to the recipient bank or agency." *Katzoff*, too, involved a false bank loan application, not a report—such as those involved here—that the law requires be made and filed. Moreover, *Katzoff* was not prosecuted under 18 U.S.C. § 2(b). For similar reasons, *United States v. Angotti*, 105 F.3d 539 (9th Cir.1997) is inapposite.

Finally, in *United States v. Pace*, 314 F.3d 344 (9th Cir.2002), the Ninth Circuit reversed a conviction of wire fraud under 18 U.S.C. § 1343 on the ground that venue was inappropriate in the District of Ari-

zona on the wire fraud charge. *Pace*, at 350. The Ninth Circuit did not hold as a matter of law that venue on the wire fraud charge could not be established in Arizona; rather, it held that the evidence introduced at trial did not establish that the defendant had used wires in Arizona or caused such use from Arizona. *Id.* Because the government failed to meet its burden of showing that the defendant began, continued or completed wire fraud in Arizona, venue was improper. Here, trial has yet to occur. On a motion to dismiss, the Court must take the factual allegations of the Indictment as true. The Indictment alleges that Rosen caused false statements to be made to the FEC based on actions he undertook in Los Angeles, California. Assuming those allegations to be true, *Pace* does not control and dismissal for lack of venue would not be appropriate at this time.[5]

## III. Motion to Dismiss for Unlawful Sealing

█ Defendant Rosen's Indictment was issued and sealed on December 4, 2003 and unsealed on January 7, 2005. Defendant admits that during that interval, he was aware of the government investigation into his fund-raising activities. Pursuant to Fed. Rules Crim. P. 12(b) and 6(e)(4), he nevertheless moves to dismiss the Indictment on the ground that it was unlawfully sealed for 13 months without any legitimate reason for doing so. The government argues that it kept the Indictment under seal to prevent the compromise of then-ongoing criminal investigations and that Defendant alleges no prejudice.[6] The

---

**5.** If anything, *Pace* supports a finding of venue here, in that the Ninth Circuit also held that venue existed in Arizona over a false tax return charge because the defendant provided information essential to his tax return in Arizona, and the "act of making a tax return commences when one prepares and furnishes information material to the return and contin-

ues until that information is received by the IRS." *Pace*, at 352.

**6.** At the hearing, the Court ordered the government to verify this justification via a sworn declaration. The declaration was filed March 21, 2005.

Court finds that the government's explanation for the lengthy sealing meets the required standard that it be "for legitimate prosecutorial objectives," *United States v. Bracy*, 67 F.3d 1421, 1426 (9th Cir.1995).

In addition, Rosen's motion lacks merit because the government unsealed the indictment before the expiration of the statute of limitations. Although Rosen does not claim that he was prejudiced, he cites *United States v. Deglomini*, 111 F.Supp.2d 198, 200 (E.D.N.Y.2000) for the proposition that he need not demonstrate prejudice. But in that case, the limitations period *had* expired, and the district court itself stated,

> The Second Circuit has required a showing of prejudice ... when it has held that the indictment was found prior to the expiration of the limitations period— that is, timely handed up and properly sealed for a reasonable time. In such a case, a defendant can escape prosecution only by demonstrating that he was actually prejudiced by the delay.[7]

*Deglomini*, 111 F.Supp.2d at 202.

The Court DENIES without prejudice Rosen's motion to dismiss the indictment for unlawful sealing.

## IV. Motion to Dismiss Counts Two, Three and Four for Multiplicity

Rosen moves to dismiss Counts Two, Three and Four of the indictment based on multiplicity. He argues that the Indictment charges one offense-that Rosen allegedly provided certain information and documents to the JFC's compliance officer and caused the compliance officer to underreport to the FEC the amount of in-kind contributions received for the Hollywood Gala fundraiser. He argues that Counts Two, Three and Four are based on the same underlying allegations and alleged wrongful conduct set forth in Count

One, without any additional or separate conduct by Rosen.

The government argues that the indictment "charges four separate and distinct false statements, three of which were made to the FEC by the campaign's compliance officers and one which was a document created by members of the production team at defendant's direction and which defendant used to mislead the compliance officer in her reporting function." Govt's Opp'n, p. 25. That is, by providing false information, defendant caused the JFC to make three separate false statements to the FEC as charged in counts One, Two and Three, and that Rosen caused the creation of a false document which was "inject[ed] into" the FEC's jurisdiction, as charged in Count Four.

■ The test for determining if multiple counts charge separate and distinct offenses is whether one count requires proof of a fact which the other does not. *United States v. Segall*, 833 F.2d 144, 147 (9th Cir.1987) (citing *Blockburger v. United States*, 284 U.S. 299, 304, 52 S.Ct. 180, 76 L.Ed. 306 (1932)). "[E]ach false document made or submitted may be charged as a separate violation of 18 U.S.C. § 1001." *United States v. Bennett*, 702 F.2d 833, 835 (9th Cir.1983). However, "[w]here identical false statements, in either oral or written form, are made in response to identical questions, the declarant may be convicted only once." *United States v. Olsowy*, 836 F.2d 439, 443 (9th Cir.1987), *cert. denied* 485 U.S. 991, 108 S.Ct. 1299, 99 L.Ed.2d 509 (1988) (defendant made exactly the same oral denial to the same Secret Service agent twice and then signed a document embodying the same denial). To that exception, there nevertheless exists another exception: if the "later false state-

---

7. An improperly sealed indictment is found upon its unsealing. *United States v. Srulowitz*, 819 F.2d 37, 40 (2d Cir.1987).

ments further impaired the operations of the government," even identical statements may be charged twice. *United States v. Salas–Camacho,* 859 F.2d 788, 791 (9th Cir.1988) (where importer made same false statement to two separate customs inspectors, each with distinct duties and functions at the border, convictions of two different counts under § 1001 was proper).

Under the "further impairment" test of *Salas–Camacho,* the three statements alleged in Counts One, Two and Three sent different messages to the FEC and each had a unique and further impact on the FEC's responsibility to collect and monitor accurate campaign contribution records. Therefore, they are not multiplicitous. However, Count Four is subsumed by Count One and cannot be charged separately. Therefore, the Court DENIES Rosen's motion to dismiss Counts Two and Three and GRANTS his motion to dismiss Count Four on the grounds of multiplicity.

### 1. Count Two

■ Count Two addresses a January 2001 amended report which declared an in-kind contribution amount that differed from the amount reported in the original October 2000 report. Thus, it was not a statement identical to the one previously filed by the JFC. The government correctly argues that a jury could find that the "impact of this report was to declare that additional information had been received and/or processed from the field and that the campaign would, as it was required to do, report all such additional information and correct any misinformation."

Defendant's suggestion that the amended report "could only mitigate the understatement," because it reported more in-kind contributions than the original report, is off the mark. Although it may have diminished the extent of the understatement, the amendment further impaired the FEC's ability to monitor campaigns because it suggested that the campaign was self-monitoring and actively disclosing all information in an effort to be accurate. *See United States v. Segall,* 833 F.2d 144, 147 (9th Cir.1987) (statement did not merely repeat previous falsehood, but "was made against the backdrop of the illusion which Segal created" by prior falsehood and gave the impression that the situation had changed, further impairing the government's investigation).

In addition, proof of Count Two will require proof of separate facts (that the amended report was actually filed with the FEC, that the amended reported figure was false, and that the defendant caused the false statement). Therefore, Count Two is not multiplicitous of Count One.

### 2. Count Three

■ Count Three involves a July 30, 2001 letter response by the JFC to a specific inquiry from the FEC regarding the information previously provided about the Gala. The government argues that the campaign's response to this specific inquiry "put the 'illusion' into a new context." The campaign appeared now to be complying with a specific inquiry which, for the first time, the government had called to the attention of the campaign. The government urges that this statement is different from the required periodic filings covered in Counts One and Two, and further impaired the FEC's operations. I agree. The July 30, 2001 letter allegedly contained the same false statement to the FEC as did the January 30, 2001 filing, but it was made six months later and under different circumstances. It was comparable to a lulling letter and it could have further impaired the FEC's operations. These facts differ from the facts necessary to prove Counts One and Two. This Count is not multiplicitous. *Salas–Camacho, supra.*

### 3. Count Four

Rosen argues that Count Four simply picks one piece of information alleged to be part of Count One—the fictitious invoice—and makes it into a separate count.

The government urges that *United States v. Kennedy*, 726 F.2d 546 (9th Cir. 1984) and *United States v. Bennett*, 702 F.2d 833 (9th Cir.1983) support the proposition that the creation of a separate document is itself a separate crime, and that, because it can prove Count One without evidence of that invoice, Count Four is not multiplicitous. In *Kennedy*, defendant was convicted under 18 U.S.C. § 1014 on three counts of making false statements to a federally insured bank in order to secure a single loan. On appeal, the Ninth Circuit applied the "proof of facts" test and held that the counts were not multiplicitous because a "separate sentence may be imposed for each false document or set of false documents submitted to the bank" under § 1014. *Kennedy*, at 548. In *Bennett*, Counts 2–45 accused defendant of violating § 1001 by submitting misleading invoices to the United States Department of Labor, and Counts 46–50 charged him with submitting reports that summarized the misleading invoices. The Court held that the counts were not multiplicitous because each false document made or submitted may be charged as a separate violation of 18 U.S.C. § 1001. *Bennett*, at 835.

There is "no bright line ... dividing charges comprising a single offense from those comprising separate and distinct offenses." *United States v. UCO Oil Co.*, 546 F.2d 833, 835 (9th Cir.1976). Here, I find, the line is blurred and to prosecute Rosen under Count Four would subject him to a multiplicitous charge. In Paragraph 15 of the Indictment and in Count Four, the government charged that it was in August or September of 2000 that Rosen faxed the fictitious invoice.

The first violation of § 1001, alleged in Count One, was committed on or about October 15, 2000. The government charged Rosen in that count not with making a series of false statements, but instead with causing a particular false report to be made to the FEC. Although Count Four requires proof that Rosen caused the fictitious invoice to be made and Count One does not require proof of the invoice, Count Four is inherently subsumed by Count One; the Indictment makes it clear that the falsity charged in Count One resulted, at least in part, from this invoice. As stated in *United States v. UCO Oil Co.*, 546 F.2d 833, 838 (9th Cir.1976), "... had the government used any particular false report as the basis for two counts, one charging a false statement and the other a concealment by trick ... the indictment would be vulnerable to attack for multiplicity." Moreover, Defendant's alleged conduct in causing the invoice to be made had no additional or different impact on the FEC than did the report charged in Count One that was based, in part, on that invoice. Count Four therefore is multiplicitous and must be dismissed.

### CONCLUSION

For the reasons discussed above, the Court DENIES Rosen's motion to dismiss the Indictment for failure to allege elements of 18 U.S.C. § 1001, DENIES Rosen's motion to dismiss the Indictment for improper venue, DENIES without prejudice Rosen's motion to dismiss the Indictment for unlawful sealing, and GRANTS IN PART and DENIES IN PART Rosen's motion to dismiss for multiplicity.

IT IS SO ORDERED.